Jason B. Lattimore, Esq.
The Law Office of
**JASON B. LATTIMORE, ESQ.  LLC**
55 Madison Avenue
Suite 400
Morristown, NJ 07960
(973) 998-7477
Jason@LattimoreLaw.com

OF COUNSEL:

Timothy R. Shannon, Esq. (*pro hac vice*)
Seth S. Coburn, Esq. (*pro hac vice*)
**VERILL DANA LLP**
One Portland Square
Portland, ME 04101-4054
(207) 774-4000
tshannon@verrill-law.com
scoburn@verrill-law.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WANGS ALLIANCE CORPORATION d/b/a WAC LIGHTING CO., <br><br> Plaintiff, <br><br> v. <br><br> CAST LIGHTING LLC, <br><br> Defendant. | Case No: 2:20-cv-3710-MCA-MAH |

## WANGS ALLIANCE CORPORATION'S
## <u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  CLAIM CONSTRUCTION OF THE '101 PATENT ........................................1

   A.  "driver housing" .............................................................................1

   B.  "sealing between the dimming control and the driver housing" and
       "provides a water tight seal"........................................................5

   C.  "insulating layer of insulating material" ...................................7

       1.  The Court May Not Import a Limitation from the Specification ....8

       2.  CAST Mischaracterizes WAC's Use of Extrinsic Evidence .........13

       3.  CAST's Primary Case Law is Distinguishable.............................14

       4.  The Function of the "Seal" does not Limit the Scope of the
          "Insulating Layer" ...............................................................15

   D.  "connected" ....................................................................................16

   E.  "covers" ..........................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002)..........................8

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed.Cir.2008)......................................................................................1, 18

*Cave Consulting Group, LLC v. OptumInsight, Inc.*, 725 F. App'x 988 (Fed. Cir. 2018 ................................................................................................3,4

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) ..................5

*Certain Consoldated Roflumilast Cases*, No. CV153375FLWDEA, 2016 WL 6089716, at *4 (D.N.J. Oct. 18, 2016) .................................................13

*CoorsTek, Inc. v. Reiber*, No. 08-CV-01133-KMT-CBS, 2011 WL 1638855 (D. Colo. May 2, 2011) ................................................................................ 14, 15

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 311 (Fed. Cir. 2020)..........................................................................................4

*Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed.Cir.2014) ......8, 9

*Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011).........................................................................................10

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004)..........................................................................................8

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).............8

*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004)....18

*MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007)..........................................................................................4

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005)..........................................14

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd., Inc.*, 133 F. Supp. 3d 721, 728
(D.N.J. 2015) .............................................................................. 20, 21

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ...... 6, 8, 9, 12, 13, 14

*Randall May Int'l, Inc. v. DEG Music Prod., Inc.*, 378 F. App'x 989, 998
(Fed. Cir. 2010) ..................................................................................19

*Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) ........7

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365
(Fed. Cir. 2012) ..............................................................................9, 10

*Titan Atlas Mfg. Inc. v. Sisk*, 894 F. Supp. 2d 754 (W.D. Va. 2012) .............. 14, 15

*TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328 (Fed. Cir. 2015)..............................8

**Statutes**

35 U.S.C. § 112(d) ......................................................................... 10, 26

Pursuant to L. Pat. R. 4.5 and the Court's Scheduling Order (ECF 17, ¶16), Plaintiff Wangs Alliance Corporation d/b/a WAC Lighting ("WAC") submits its responsive claim construction brief.

## I.   INTRODUCTION

In its opening *Markman* brief, CAST disregards multiple tenets of claim construction – primarily and sometimes transparently in an effort to narrow the claims to avoid infringement.  The Court should reject the effort.

## II.   CLAIM CONSTRUCTION OF THE '101 PATENT

### A.   "driver housing"[1]

It is blackletter law that the starting point for claim construction is the claims.  *E.g. Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("We look first to the claim language itself, to define the scope of the patented invention").  Yet in its opening brief, CAST does not address the claim language at issue ("driver housing"), conceding WAC's point that "driver housing" is broad enough to encompass both unitary and multi-component embodiments. CAST further concedes that the enclosure cap serves the same purpose as the claimed "driver housing."  ECF 40 ("CAST Br.") at 21 (enclosure cap and main housing body "cooperate" to enclose the fixture).  Given the primacy of claim

---

[1] For the convenience of the Court, we present the disputed claim terms in the order the parties presented them in their L.Pat.R. 4.3 submission (ECF 35), consistent with our opening brief.

1

language in the claim construction process, the Court need not go any further.

To the extent any ambiguity still existed (none does), dependent claim 18's explicit inclusion of the enclosure cap as part of the driver housing resolves it. The limitation in claim 18 ("wherein said driver housing further includes a driver housing enclosure cap . . . being a detachable bottom wall of said driver housing") is presumptively subsumed within the scope of the preceding independent claim. That is, claim 1, on which claim 18 depends, must be broad enough to include driver housings both with and without an enclosure cap. *See generally* ECF 43 ("WAC Br.") at 10-11.

Apparently in recognition of this dilemma, CAST asks the Court to ignore claim 18. *See* ECF 40 ("CAST Br.") at 21-22. CAST's first rationale – an alleged lack of written description per 35 U.S.C. § 112(a) – comes too late. CAST never raised a written description defense with regard to claim 18 in its L. Pat. R. 3.3 Invalidity Contentions or in its L. Pat. R. 4.2 or 4.3 statements and therefore has waived it.[2] Even if the argument were preserved and timely (it is not), it falls short

---

[2] CAST subsequently sought to add a written description defense via its "Supplemental Invalidity Contentions," which WAC opposes. ECF 22. The Court has yet to rule on this issue. As a result, CAST's invalidity theories are limited to those raised in its original Invalidity Contentions. CAST's attempt to introduce a written description defense through the backdoor should not be ignored.

2

on the merits.[3]  The specification expressly discloses the enclosure cap as part of the driver housing.  *See, e.g.*, Ex. 1 ('101 Patent)[4] at 5:66-6: 6 (threaded portion of enclosure cap part of "enclosure 540," *i.e.* the "driver housing"), Fig. 1; *see also id*. at 26:11-13, Figs. 18, 36.  CAST never addresses this fact.  CAST also tries to argue that claim 18 lacks interpretive force because it was added via amendment during prosecution.  CAST misleadingly cites *Cave Consulting Group, LLC v. OptumInsight, Inc.*, 725 F. App'x 988 (Fed. Cir. 2018) for the proposition that claims added via amendment cannot bear on the meaning/scope of other claims.  That is not what *Cave Consulting* stands for.  At issue in *Cave Consulting* was whether a subsequently added claim that added new subject matter could be used to construe terms appearing in claims submitted in the original application, effectively collapsing back onto the same written description analysis above.  *See* 725 F. App'x at 994-95.[5]  The answer here is the same.  The specification does

---

[3] Procedurally, CAST's written description argument fails because it is not ripe for adjudication.  CAST essentially seeks summary judgment of invalidity with respect to claim 18.  It cannot do that now.  ECF 17, ¶ 28 (dispositive motions must be specifically requested, preliminarily heard, and cannot be sought until discovery closes).

[4] U.S. Patent 10,571,101.  Exhibits 1-12 are attached to the Declaration of Timothy R. Shannon in Support of Wang's Alliance Corporation's Opening Claim Construction Brief ("Shannon Decl.") (ECF 43-1 to 43-13).  Exhibits 13-18 are attached to the Declaration of Timothy R. Shannon in Support of Wang's Alliance Corporation's Responsive Claim Construction Brief ("Shannon Decl. II")

[5] In *Cave Consulting* the patent-in-suit was directed to measuring physician efficiency covered both direct and indirect standardization techniques.  *See* 725 F.

expressly disclose the enclosure cap as part of the driver housing. *See, e.g.*, Ex. 1

('101 Patent) at 5:66-6: 6 (threaded portion of enclosure cap part of "enclosure

540," *i.e.* the "driver housing"), Fig. 1; *see also id*. at 26:11-13, Figs. 18, 36.

Rather than opposing WAC's construction, *Cave Consulting* lends support to

WAC's position. *See Cave Consulting*, 725 F. App'x at 994-95.

Even if neither the specification nor claim 18 expressly disclosed the

enclosure cap as part of the housing (they do), CAST nonetheless invites reversible

error when it urges the Court to narrowly construe "driver housing" to cover only

those embodiments that look like those shown in the figures of the '101 patent.

Ex. 1 ('101 Patent) at Fig. 6B. Claims are not limited to the embodiments shown

in the figures. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323,

1333 (Fed. Cir. 2007) (reversing lower court's construction that was based the

embodiments shown in the figures, noting that "[t]he patent figures all depict the

[component] connected mainly to the outside, but patent coverage is not

---

App'x at 990-91. There, however, the specification expressly limited its claimed
method to indirect techniques, contrasting them to the direct techniques of the prior
art. *Id.* at 994-95. The dependent claim added during amendment sought to
capture direct techniques, which the patentee had already disclosed as prior art.
*See id.* As the Federal Circuit in *Cave Consulting* noted, "had the originally filed
application . . . in *any* way indicated that its invention included direct
standardization, the later-added dependent claims specifically claiming "direct
standardization' could have lent support to [patentee's construction]." *Id.*
(emphasis in original).

4

necessarily limited to inventions that look like the ones in the figures.").

Undeterred, CAST contends that unless the specification shows a multi-component driver housing that includes an enclosure cap (it does), the claims cannot be construed to include such an embodiment.  This is not the law.  In *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002), like here, the parties disputed whether a claim term ("reciprocating member") was limited only to single-component structures.  As here, the claim language was broad enough to encompass either single or multi-component structures.  *See id.* 1363 ("nothing in the claim language . . . describes the shape of the reciprocating member or whether it consists of a single-component structure only, as opposed to a structure consisting of multiple components.").  The drawings in the specification only depicted one of the two possible embodiments.  *See id.* at 1364 (drawings only depicted single-component structure).  Noting that "the specification did not need to include a drawing of a multi-component, curved member for the claimed invention to cover that particular embodiment," the Federal Circuit construed the disputed term to cover both single and multi-component embodiments.  *Id.* at 1367.  The facts here - where there is intrinsic support for WAC's construction - are even stronger.  *See id.* (relying on extrinsic evidence).  The Court should therefore adopt WAC's proposed construction.

**B.     "sealing between the dimming control and the driver housing" and "provides a water tight seal"**

5

CAST asks the Court to inject a vague phrase ("normal operation of the LED lighting device") that appears nowhere in the claims or specification into the "sealing between ... the driver housing" and "provides a water tight seal" terms. This addition serves no purpose other than to introduce ambiguity and uncertainty into the claims and create additional questions for the fact finder. The predictable result would be to give CAST more opportunities to manufacture a possible fact dispute where, in truth, there is none.

CAST never disputes that a POSITA would understand these two terms in context, *i.e.,* they do not refer to absolutes. CAST Br. at 24 ("A POSITA would understand these terms not in absolutes ... but in relation to the environmental conditions associated with intended uses of the claimed lighting fixture"). The law already accounts for this. Claims are to be read from the perspective of a POSITA who brings with him/her "an understanding of [a term's] meaning in the field." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). With that comes the perspective of what a term would mean in context, *i.e.,* a given use case. CAST's proposal is therefore doctrinally unnecessary and redundant.

On top of this, CAST's proposal would create more problems for a fact finder than it would solve. The phrase "normal operation of the LED lighting device" does little, if anything, to assist a lay fact finder. A lay fact finder, say a juror, would almost certainly have no basis for independently understanding what

6

constitutes "normal operation" for a particular lighting device. Such a phrase

invites testimony and evidence on what, exactly, is "normal operation." The

predictable (and perhaps intended) result is dueling evidence and/or dueling

experts, *i.e.* a fact dispute.

In contrast, WAC's proposed construction clarifies the claim language

(requires resistance to dirt and water) and where the sealing must occur (at the

circular seal). These (minor) clarifications do assist the fact finder in that they

provide a more coherent explanation of the claim term. *See, e.g. Sport Dimension,*

*Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (claim construction

proper to help guide the fact finder through issues of claim scope). As such, the

Court should adopt WAC's proposed constructions.

## C.   "insulating layer of insulating material"

CAST contends that because the specification allegedly provides only one

example of an insulating material – a false premise, addressed below – the claims

must be so limited.[6]  CAST argues that the specification uses the label "insulating"

only once (as if the label were determinative) and the only purpose described in

---

[6] CAST makes its claim construction argument in service of its non-infringement argument. We note, however, that contrary to CAST's assertion, CAST's hoped-for construction would not dispose of the case. CAST's expert has opined in a declaration on the benchmark measurements required of "good thermal insulators." CAST's silicone potting material meets that benchmark. Therefore, even under CAST's proposed construction, CAST's accused product meets the "insulating layer" limitation.

this one example is thermal insulation.  CAST Br. at 12.[7]  From this CAST

concludes that the term in the claim may not encompass anything else.  *Id*. at 16.

CAST's entire mode of argument is to start with the specification (*see, e.g.*, *id*. at

7, 11-12), and from the specification argue that the term must be limited to that one

example.  This is all backward, and wrong.

### 1.    The Court May Not Import a Limitation from the Specification

It is blackletter law that a court may not import limitations from the

specification into the claims.  *Phillips*, 415 F.3d at 1323 ("Although the

specification often describes very specific embodiments of the invention, we have

repeatedly warned against confining the claims to those embodiments.").  In

particular, the Federal Circuit has "expressly rejected the contention that if a patent

describes only a single embodiment, the claims of the patent must be construed as

being limited to that embodiment."  *Id.; Liebel-Flarsheim Co. v. Medrad, Inc.*, 358

F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a

single embodiment, the claims of the patent will not be read restrictively unless the

patentee has demonstrated a clear intention to limit the claim scope using words or

expressions of manifest exclusion or restriction."); *Hill–Rom Servs., Inc. v. Stryker

Corp.,* 755 F.3d 1367, 1371 (Fed.Cir.2014) ("While we read claims in view of the

---

[7] Indeed, CAST never explains why a partial label ("insulating," rather than the
complete term, "insulating layer of insulating material") should be determinative.

specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.").

CAST has utterly ignored this axiom, inviting error.  Even if the specification only disclosed one embodiment of an insulating layer (it does not), the Federal Circuit has consistently rejected this mode of argument.  *Phillips v. AWH Corp.*, 415 F.3d at 1323; *Hill-Rom Servs., Inc.*, 755 F.3d at 1371; *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  The plain and ordinary meaning of the term, "insulate," encompasses far more than just thermal resistance – a point CAST concedes[8] – and a mere scarcity of examples (even if it were the case here, which it is not) does not alter this fact or the scope of the claims.

The Federal Circuit has made clear the Court should "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal."  *Hill-Rom Servs.*, 755 F.3d at 1371 ("There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.") (*citing*

---

[8] CAST acknowledges, for example, that the term can encompass electrical insulation.  *See* CAST Br. at 15 (favorably citing another court's construction of "insulation" as encompassing "electrically insulating material").

*Thorner*, 669 F.3d at 1365).  CAST never contends either.  CAST never asserts (because it cannot) that the patent applicant expressly defined the particular word, "insulating," in the specification.  CAST never asserts (because it cannot) that the applicant disavowed the full scope of the term.  *Thorner*, 669 F.3d at 1366 ("The standard for disavowal of claim scope is similarly exacting.").  The applicant never called out and disclaimed or disparaged electrical insulation or water insulation, *cf. id*. (reciting examples, including disparagement of particular embodiments).  There are no words of manifest exclusion or restriction, no indication that "insulating layer" was intended to be limited to only one embodiment in the specification, the insulating film 552, *e.g.,* through the use of telltale markers like, "the present invention is . . ." or "the present invention requires . . . ."  *Id*. (reciting examples). Put simply: the claim language is broad; the applicant never disavowed its breadth; that ends the dispute.

Put differently, the "layer" is a genus and absent a disavowal of various species in the genus, the genus should not be limited to the exemplary "film" (thin layer) species.[9]  This genus/species distinction is consistent with the prosecution history.  The inventors of the '101 Patent knew how to claim the narrower

---

[9] Cf. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011) "[S]o long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description."  (internal citations omitted).

"insulating film."  They did so in their related '832 patent.  *See* Ex. 9 (U.S. Patent No. 10328,832) at 50:24 (claim 1) ("insulating film covering a top portion").  Here in the later-filed '101 Patent, claiming priority to the same original application and sharing the same specification, the inventors claimed the broader concept of an insulating "layer."  Ex. 1 at 50:42 (claim 1) and 51:39 (claim 11).

Moreover, the factual premise of CAST's (improper) importation-of-limitations analysis – that the specification only gives one example of insulation – is also wrong.  The disclosed invention plainly concerns much more than thermal management.  The claims place the insulating layer between the flat bottom surface and the driver assembly – an electrical component.  *Id*. at 50:42-45.  Other portions of the independent claims concern electrical matters (resistor, dimming, wire) and moisture control (circular seal, sealing, water tight).  *See, e.g., id*. at 50:27-31 (electrical components), 50:32 (moisture seal).  And the specification addresses water, electrical, and environmental concerns of outdoor lighting.  *See, e.g., id*. at 1:27-55 (protection from "dirt and water", exposure of "electrical elements"), 19:55-64 (electronics protected "through the use of several *layers* of seals") (emphasis added).  The insulating layer thus engages more than thermal management, addressing the electrical, moisture, and physical features of the

whole device.[10]

In other words, quite apart from the analytical flaw of limiting the claims based on the "insulating film 552" embodiment, *see Philips*, CAST has simply ignored the other instances of water, dirt, and electricity blocking associated with other insulative layers in the specification, such as the "potting" material that coats the driver assembly electronics to insulate them from water.   Ex. 1 ('101 Patent) at 27:39-49 (potting provides "waterproofing of said driver assembly"); 33:59-34:3 (potting "provides a water tight seal"); 33:63-66 (electrical "wires" are protected from moisture); 34:27-28 ("silicone glue seals the electrical connector 2344").[11]   In particular, the specification makes clear that the potting is protecting against the movement of water that is already inside the housing, *i.e.* through a leak, condensation, or other intrusion: "[T]he "silicone material . . . acts as a potting material for the driver assembly and . . . stabilizes, secures and waterproofs the driver assembly 554 *within the cavity* of the driver housing 540."   25:55-62 (emphasis added).   The potting does not stop water at the perimeter alone; it is

---

[10] More generally, the specification teaches variations, alternatives, and different embodiments. *See, e.g.*, *id*. at Figs. 1, 12, 20 (different embodiments), claims 6-8 (differentiating landscape, flood, and spotlight inventions).

[11] The potting fully encapsulates the driver assembly. *See id*.; *see also id.* at 33:59-34:3 ("the driver assembly 2336 being potted, *e.g., set into*, the glue to provide a water tight seal") (emphasis added).  The potting exists "within the cavity" of the housing, *see, e.g.*, at 25:55-62, not merely at the boundary, further indicating that the potting is covering the driver assembly.  Further, that is the nature of "potting."

inside, covering the driver assembly. *Id*. The factual predicate for CAST's (improper) analysis is simply wrong.

### 2.   CAST Mischaracterizes WAC's Use of Extrinsic Evidence

CAST also mischaracterizes WAC's use of extrinsic evidence, bizarrely asserting that WAC is ignoring the specification and citing "contradictory evidence." CAST Br. at 13. Not true. WAC is following the *Phillips* protocol: starting with the claim language, working through the specification, before finally comparing the proposed construction with the ordinary dictionary definition – and noting that they match. *See* WAC Br. at 20-24. The dictionary definition simply confirms what the claims teach and the specification supports, and provides the common understanding of a word. This is normal. *Phillips*, 415 F.3d at 1319 ("extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean"), *id*. at 1322 ("As we have noted above, however, we do not intend to preclude the appropriate use of dictionaries. Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words . . .").[12]

---

[12] CAST's case law is likewise inapposite. CAST cites *In re: Certain Consolidated Roflumilast Cases*, No. CV153375FLWDEA, 2016 WL 6089716, at *4 (D.N.J. Oct. 18, 2016), but in that case the disputed term was defined in the specification and the Court rejected a different, narrower definition. *Id.* ("the term roflumilast is introduced with the following statement: "[t]he present invention relates to a novel,

13

CAST's suggestion that WAC is attempting to "expand" the meaning of the term is likewise backwards, CAST Br. at 12, as if trying to preserve the plain and ordinary meaning consistent with the use in the clams and specification represents an expansion. Indeed, WAC's construction does not include irrelevant words from the dictionary definition (*e.g.*, sound) precisely because WAC has sought to define the term based on the context of the '101 Patent.

### 3. CAST's Primary Case Law is Distinguishable

CAST's lengthy discussions of *Titan Atlas Mfg. Inc. v. Sisk*, 894 F. Supp. 2d 754 (W.D. Va. 2012) and *CoorsTek, Inc. v. Reiber*, No. 08-CV-01133-KMT-CBS, 2011 WL 1638855 (D. Colo. May 2, 2011) also miss the mark. In *Titan*, the invention at issue was a mine ventilation structure. *Titan*, 894 F. Supp. 2d at 758. That court idiosyncratically *started* with a dictionary definition ("heat and sound," *id*. at 767) and then narrowed the definition based on that patent specification's references to flames and heat but not sound. *Id.* Aside from not following *Philips*

---

improved process for the preparation of N-(3,5-dichloropyrid . . . (INN: roflumilast).").  WAC is not seeking any such ruling here; there is no definition in the patent-in-suit that WAC is seeking to alter.  Likewise, CAST cites *Nystrom v. TREX Co*., 424 F.3d 1136 (Fed. Cir. 2005), but the court in that case was balking at one party's attempt to overcome a plain and ordinary meaning acknowledged by both parties.  "[B]oth parties acknowledge the ordinary meaning of 'board' as 'a piece of sawed lumber."  *Nystrom*, 424 F.3d at 1145.  The plaintiff nonetheless attempted to employ a different and "obscure" dictionary definition (*i.e.,* defining a board as a "similarly rigid material adapted for a special use").  *Id*.  That is not the case here; WAC is specifically trying to preserve the ordinary meaning, not to expand the word beyond its ordinary meaning.

14

orthodoxy, the *Titan* case is distinguishable on the ground that the patent-in-suit here *does* include multiple references to water protection, as well as the electrical circuitry covered by the insulating layer. *See, e.g.,* '101 Patent at 1:27-55, 19:55-64; 25:55-62; 27:39-49; 33:59-34:3. Likewise, *CoorsTek* is distinguishable. In *CoorsTek*, the invention at issue concerned tools for welding delicate gold wires to semi-conductor chips. *CoorsTek*, 2011 WL 1638855, at *1. The parties did not dispute what forces were being "insulated" (sound, heat, electricity, etc.). *See, e.g., id.* at *15 and *18. Rather, the only question was the degree of electrical insulation that constituted "insulating." *Id.* at *18. The court balked at one party's use of a glossary term ("resistivity") to define a different term in the patent ("resistance"). *Id.* at *9 (laying out the dispute), *15 (recapping). The language CAST quotes in its brief has nothing to do with the present case; the fact patterns are completely different.

### 4. The Function of the "Seal" does not Limit the Scope of the "Insulating Layer"

Finally, CAST's lengthy distinction of "seal" from "insulating layer" misses the mark. CAST Br. at 16-17. WAC has never argued that the claimed "circular seal" is the same as the claimed "insulating layer." They are different components, appearing in different portions of the claims, positioned differently. All true. That does not mean, however, that they cannot perform similar functions in service of a common goal – particularly if they are operating at different locations in the

15

device.  The presence of a circular seal to protect against water intrusion from the exterior does not imply or require that other, interior components cannot also try to further protect against water reaching the electronics.  Quite the opposite; the "seal" highlights the same problem (water and dirt reaching sensitive electronics) that the insulating layer may further combat.  CAST's reading artificially narrows "insulating layer" in defiance of this logic.  The "seal" addresses water/dirt intrusion from outside the housing, blocking it beyond the point where the seal is positioned, and the "insulating layer" addresses water/dirt/electricity closer to the electronics themselves.

CAST confuses the analysis by pointing to seals and water protection at locations other than the target space (between the flat bottom/ceiling and the top of the driver assembly), *see* CAST Br. at 16-17, to argue that a POSITA would not consider the layer that *is* in the target space to be an insulating layer.

In sum, contrary to CAST's efforts to artificially and illogically narrow the term's (undisputed) plain meaning based on CAST's allegation of "only one" example in the specification, the term should encompass the full range of insulation types taught by the intrinsic record – *i.e.,* against heat, water, or electricity.

**D.     "connected"**

16

On the merits – which we address before turning to CAST's lengthy procedural complaints – CAST begins its analysis by labelling the two components identified in claim 2 (*i.e.* wire and circuit board) as "electrical components," *see* CAST Br. at 27, and from there argues that "connection" must refer to the electricity that flows through them.  Not true.  While both components of course carry electricity, the '101 Patent uses "connected" to address different aspects of their existence, *i.e.,* their physical dimensions, locations, and orientations, including *where* they are connected.  The relevant claims are directed to tangible details, not the flow of electrons, circuit topology, etc.  *See e.g. Ex. 1 (*'101 Patent) at 50:49-52; 52:10-11 (describing a physical link between the claimed "first wire" and a particular "first" side of the circuit board, physical passage "through" the insulating layer*).*  CAST's "electrical component" label obscures this fact, presumably by design.

CAST ignores these physical requirements imposed by the claim language.  CAST Br. at 27 (no mention of first side, passage through insulation, required by claim 2).  By the same token, CAST does not, and indeed cannot, point to any claim language describing the relationship between the first wire and the circuit board in electrical terms, *e.g.,* particular voltages, particular frequencies, etc.  CAST Br. at 24-28.  This omission is telling.  *See Liquid Dynamics Corp. v.*

*Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("We look first to the claim language itself, to define the scope of the patented invention").

CAST instead relies on selective portions of the specification, declaring each snippet to be evidence that "connected" refers to an electrical connection. CAST Br. at 27-28. In fact, the cited passages consistently describe physical characteristics and relationships, *e.g.,* structures through which the wires are extending, cavities in which the wires are placed, particular locations on the driver the wires are attached to. CAST Br. at 27-28 (quoting specification of '101 Patent). These snippets only serve to support WAC's construction: "connected" describes a physical relationship.

CAST compounds its error by failing to address the myriad of ways in which its proposed construction is at odds with the law and the intrinsic record. CAST never addresses the way its proposed construction erases any distinction between "connected" and "coupled," a disfavored construction. *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed.Cir.2008) ("Different claim terms are presumed to have different meanings"). CAST never addresses the way its proposed construction reads out the "first side" limitation in claims 2 and 12, a legal error. *See Randall May Int'l, Inc. v. DEG Music Prod., Inc.*, 378 F. App'x 989, 998 (Fed. Cir. 2010) ("[t]he district court's elision of the claim limitation … is legal error"). Nor does CAST address the '101 Patent's use

18

of "connected" elsewhere to describe the relationship of two components that indisputably do not carry electricity. *See, e.g.*, '101 Patent at 20:13-16 (tilting mechanism "connected" to main fixture body); *id.* at 20:59-61 (dimming control knob "connected" to the housing).

The flimsiness of CAST's position helps explains the amount of space CAST devotes to its meritless procedural objection. Put simply, CAST cannot credibly claim any prejudice. CAST was on notice of WAC's proposed construction of "connected" on November 11, 2020. *See* Ex. 17. This gave CAST 12 days before the filing of the parties' L. Pat. R. 4.3 joint statement to propose changes to its construction or supporting evidence. CAST did neither, instead opting to try and force WAC to drop the term altogether (despite having initially proposed it).[13] *See* Ex. 18. CAST then had another four weeks (28 days) until its opening claim construction brief was due on December 21, 2020 to make any necessary adjustment. *See* ECF 17 ¶ 15. CAST choose not to.

---

[13] CAST's constantly changing posture with regard to "connected" understandably gave WAC pause. CAST first proposed construing "connected," but then was tight-lipped when asked what possible dispute there was on the meaning of the term. *See* Ex. 15 at 1. When confronted with WAC's proposed construction CAST changed course, seeking to drop the term while conspicuously reserving the right to pursue its claim construction "elsewhere." CAST now has come full circle, arguing again for its original construction. Given CAST's reservation of rights to pursue its (doomed) construction of "connected" elsewhere, it is apparent that WAC and CAST continue to dispute the meaning of this claim term.

19

CAST's claim that WAC obtained an "unfair tactical advantage" also runs counter to the stated purpose of L. Pat. R. 4.1 and 4.2. *See Otsuka Pharm. Co. v. Torrent Pharm. Ltd., Inc.*, 133 F. Supp. 3d 721, 728 (D.N.J. 2015) (purpose is to allow for "maximum consideration of all evidence necessary for the judge to make an educated and informed decision on the proper construction."). The Rules contemplate the parties' modifying their positions over the course of the process. *See* L. Pat. R. 4.1 (b) (requiring meet-and-confer to discuss, *inter alia*, "narrowing or resolving differences"), 4.2(d) (requiring meet-and-confer for purposes of attempting to narrow the issues). Proposed constructions exchanged pursuant to L. Pat. R. 4.2 are "preliminary," *i.e.,* non-final. *See* L. Pat. R. 4.2(a) (requiring the parties to exchange "preliminary proposed constructions"). The purpose is not to lock the parties into an initial position, but rather to choreograph a back-and-forth designed to whittle down and crystalize any claim construction disputes for the Court's benefit. *See Otsuka Pharm. Co.*, 133 F. Supp. 3d at 728. The rules operated as intended here. CAST had ample notice of what issues would be presented to the Court and had ample opportunity to oppose.

Returning to the merits: WAC's construction is supported by both the evidence and the law. The Court should adopt it.

### E.    "covers"

As noted in the opening brief, since filing their L. Pat. R. 4.3 Joint

Statement, the parties have resolved their dispute concerning the construction of "covers." Both parties agree that the term should be construed to mean "extends over."

Dated:        January 29, 2021              Respectfully submitted,

                                             *s/ Jason B. Lattimore*
                                            Jason B. Lattimore
                                            The Law Office Of
                                            JASON B. LATTIMORE, ESQ. LLC
                                            55 Madison Avenue, Suite 400
                                            Morristown, NJ 07960
                                            Telephone: (973) 998-7477
                                            Facsimile:  (973) 264-1159
                                            Jason@LattimoreLaw.com

                                            Timothy R. Shannon (*pro hac vice*)
                                            Seth S. Coburn (*pro hac vice*)
                                            VERRILL DANA LLP
                                            One Portland Square
                                            Portland, Maine 04112-0586
                                            (207) 774-4000
                                            tshannon@verrilldana.com
                                            scoburn@verrilldana.com

                                            *Attorneys for Plaintiff*
                                            *Wangs Alliance Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of this document to be filed in accordance with the Court's procedures through the CM/ECF system, to be sent electronically to the registered participants, and paper copies to be sent to those indicated as nonregistered participants.


Dated:  January 29, 2021                  s/ *Jason B. Lattimore*
                                          Jason B. Lattimore

14603313_10